UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHENISE L. P.,                          )
                                        )
        Plaintiff,                      )
                                        )
    vs.                                 )          Case No. 4:19 CV 2692 (JMB)
                                        )
ANDREW M. SAUL,                         )
Commissioner of the Social              )
Security Administration,                )
                                        )
        Defendant.                      )

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On September 25, 2015, plaintiff Shenise P. protectively filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of August 11, 2015.[1]  (Tr. 145-48).  She subsequently amended her alleged onset date to January 1, 1983.[2]  (Tr. 151).  After plaintiff's application was denied on initial consideration (Tr. 94-98), she requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 99).

Plaintiff appeared for a hearing on December 15, 2017.  (Tr. 37-79).  She was not represented at the time and declined the ALJ's offer to postpone the hearing to obtain a

---

[1] A prior application was denied on initial consideration in 1994.  (Tr. 166).

[2] As discussed below, plaintiff was in a motor vehicle accident in 1983 when she was 9 years old.

representative.[3]  (Tr. 40).  Plaintiff testified concerning her disability, daily activities, functional limitations, and past work.  The ALJ also received testimony from vocational expert Brenda Young, M.A.  The ALJ issued a decision denying plaintiff's application on August 8, 2018.  (Tr. 20-31).  The Appeals Council denied plaintiff's request for review on July 31, 2019.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability and Function Reports and Hearing Testimony

Plaintiff was born in November 1973 and was 41 years old on the application date and 9 years old on the amended alleged onset date.  (Tr. 81).  She lived in an apartment with her two-year-old son and received Medicaid benefits.[4]  (Tr. 48, 184).  She completed high school with special education classes.  Between 1996 and 2004, plaintiff operated a daycare center.  (Tr. 192).  She worked as a home health aide for her "ungrateful grandmother" between 2008 and 2009.  (Tr. 193).  She attended truck driving school in 2013 but quit after nearly "kill[ing] two families on the highway during a dust storm."  (Tr. 170, 150).

Plaintiff alleged several disabling conditions at various points in the administrative proceedings:  In her application, plaintiff claimed only a learning disability and postpartum depression.  (Tr. 169).  In her October 2015 Function Report (Tr. 175-82, 238-44) and Supplemental Questionnaire (Tr. 183-85), plaintiff stated that she suffered from postpartum depression, a learning disability, plantar fasciitis, a uterine fibroid, labor contractions, chronic migraine, head trauma, broken tail bone, herpes, pelvic pain, lack of bladder control, high

---

[3] Plaintiff obtained representation on October 9, 2018, while her case was pending before the Appeals Council.  (Tr. 15-16).

[4] Plaintiff also has an adult daughter.

cholesterol, past exposure to tuberculosis, charley horses, and shortness of breath.  In April 2016, plaintiff listed her conditions as PTSD, herpes, heavy bleeding, worsening plantar fasciitis, abdominal and back pain, enlarged fibroid, "a lot of outbreaks of herpes," and respiratory issues. (Tr. 214-22).

In her Function Report, plaintiff stated that she was unable to work because she was "spacey" and "always sleepy," and found it hard to retain information.  She spoke her mind "boldly" without a filter and was "sick of people."  Plaintiff also alleged that she was unable to work due to the psychological effects of witnessing the death of her aunt in a motor vehicle accident in 1983.  Plaintiff stated that she regularly relived being covered in her aunt's blood and "spoke" with her aunt every day.  She spent her time daydreaming, trying to learn something new, and rubbing her feet.  She also took care of her son who required a lot of medical appointments and daily medications.  In discussing her ability to manage personal care, plaintiff stated that she could dress and bathe with "no problem just to[o] much pacing" and it was a "long process" to feed herself.  (Tr. 176).  She prepared cereals and breakfast food.  She did not state what household chores she engaged in, saying only that it took her days to clean up.  She was able to drive, use public transportation, shop, and manage financial accounts, although counting change was "hard." She did not get along well with others and stated that she did not trust others, because they had germs and were thieves and liars.  She had been fired "all the time" for being rude to people who were rude to her.  She responded to stress by sleeping and did not handle changes in routine "at all."  She did not need reminders to take medication.  She could pay attention for 4 to 6 minutes. She did not answer a question about her ability to follow written instructions and suggested that she could not follow spoken instructions because she was distracted by seeing her "Aunt Mary bloody in [her] mind."  Plaintiff had difficulty with lifting, squatting, standing, sitting, kneeling,

talking, hearing, remembering, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with others.  She had pain in her feet and back and was unable to sit for long.  Her medications included meloxicam, trazodone, and bupropion.

Plaintiff testified at the December 2017 hearing that she was unable to return to work because she had several mental health issues and suffered from migraines.  (Tr. 55).  On her good days, she was able to watch television, but it could trigger her migraines which could last between two days and two weeks.  (Tr. 64-65).  She also had bilateral chronic plantar fasciitis, which affected the way she walked and caused pain in her back and legs.  A podiatrist had recently taped both her feet to keep them from curling up.  She used a cane or walker because she was susceptible to falls.  (Tr. 55-57).  She had painful outbreaks of herpes, uterine cramps, heavy bleeding, and loss of bladder control.  (Tr. 75, 60, 65-66).  She also suffered from depression.  She explained that after her aunt's traumatic death, she was unable to talk, kept hearing the accident, and felt the presence of her aunt and other spirits.  (Tr. 58).  As a consequence, she required unspecified special education services.  As an adult, she saw a therapist,[5] but stopped keeping her appointments because her son — who was born prematurely and needed open heart surgery — had a lot of medical appointments.  (Tr. 59).  She stated that the mornings she was able to get him dressed were her "proudest moments."  There were mornings, however, when she called a family member or friend to dress him and take him to daycare.  (Tr. 62-63).  She testified that she received prepared meals and that home health aides cleaned her house.  (Tr. 64).  She described her house as looking "like a hoarder's" and said she was trying to get additional hours of home health care so they could help her "get the house back in order."  She experienced social anxiety and had as many as eight

---

[5] The administrative transcript does not include any records from a mental health specialist.

panic attacks a week.  (Tr. 60-61).  They were triggered by hearing dead people talking to her.  She required breathing treatments.

Vocational expert Brenda Young testified that plaintiff's past work as a home health aide and truck driver were not performed long enough to qualify as substantial gainful activity.  Her work as a childcare worker was classified as medium and semiskilled.  (Tr. 68-69).  Ms. Young was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform light work, but who could never climb ladders, ropes, or scaffolds; operate foot controls; kneel; or crawl; should never be exposed to irritants or unshielded moving parts; and should not drive.  The individual could occasionally climb ramps or stairs, balance, stoop, or crouch. The individual was able to remember, understand, and carry out simple and routine instructions and tasks consistent with "SVP levels 1 and 2 type jobs;"[6] and should have only occasional interaction with the general public and coworkers.  (Tr. 69-71).  According to Ms. Young, such an individual would be unable to perform plaintiff's past relevant work as a childcare worker.  (Tr. 69).  Other jobs were available in the national economy, such as light housekeeping, dining attendant, and small product assembly.  (Tr. 71-72).  The ALJ next asked Ms. Young about employment opportunities if the individual were limited to sedentary work and had to use a handheld assistive device when standing but was able to lift and carry up to the exertional limits with the other hand.  (Tr. 72).  Such an individual would be able to perform work in sedentary assembly, circuit board work, and "assembly atomizers or other small

---

[6] "SVP" refers to Specific Vocational Preparation, defined in Appendix C of the <u>Dictionary of Occupational Titles</u> (DOT) as being "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  A position with an SVP of 1 requires a short demonstration only while an SVP of 2 requires vocational preparation of no more than one month.  The SVP does not address the abilities to interact with others and adapt to the work environment.

products."[7]  (Tr. 73).  All work would be precluded if the individual was off-task 15 percent or

more of an 8-hour workday or had two or more unexcused absences in a month.  (Tr. 74).   Ms.

Young stated that her testimony was consistent with the Dictionary of Occupational Titles (DOT),

apart from information regarding time off-task, absences, and sedentary assembly jobs[8] which the

DOT did not address.  Her testimony on these issues was based on her experience in job placement

and analysis.  (Tr. 75).

### B.    Medical Evidence

In January 2010, plaintiff sought emergency treatment for pain in her lower abdomen and

back.  (Tr. 430-31).  She explained that she had been in a car accident about 12 days earlier, at

which time she was treated and given pain medication.  She was in pain and recently developed

blood in her stools.  A test for occult blood in the stool was negative.  On examination, she had

normal ranges of motion, normal gait, and no neurological deficits.  X-rays and CT scans did not

disclose any injury.  (Tr. 454-58).  She was provided with a muscle relaxant, pain medication, and

back exercises and directed to follow up with her primary care provider.  An ultrasound in April

2010 disclosed an ovarian cyst and uterine fibroid.  In July 2010, plaintiff sought emergency care

after her uncle hit her in the head, either with a hammer or his fist.  (Tr. 426-29).  A CT scan was

negative for trauma but disclosed a sinus infection.

There are no records of further medical care until November 2013, when plaintiff was seen

at SSM Health St. Mary's in St. Louis by pulmonary specialist Rael D. Sundy, M.D.   (Tr. 424-

25).  Plaintiff reported that she had been exposed to fumes in August 2013.  Since then, she

---

[7] Much of the discussion regarding sedentary jobs was inaudible and was not fully transcribed.  (Tr. 73).

[8] Ms. Young testified that the DOT classifies as all assembly jobs in the light work category but that she was aware that some assembly work was performed at the sedentary level, including those she identified. (Tr. 72, 75).

remained short of breath and was unable to walk more than a half block on level ground, which was a significant decline from her usual level of activity.  Pulmonary function tests were abnormal and showed a decrease in lung capacity.  A CT scan was negative, apart from sinus disease.  (Tr. 445).  A chest x-ray was negative for heart disease but showed a probable benign congenital cyst in the liver, a right renal cyst, and a nodule in one breast.  (Tr. 447).  In January 2014, plaintiff underwent a bronchoscopy and biopsy, which were both normal.  (Tr. 422-23, 440, 420-22).  Dr. Sundy assessed plaintiff with possible vocal cord dysfunction.  He prescribed an inhaler and referred her to an otolaryngologist.  There is no report that plaintiff followed up on that referral.

There is another gap in the medical records until December 29, 2014, when plaintiff sought prenatal care at SSM Health St. Mary's.  (Tr. 418-20).  She was at 12 weeks gestation.  Her age — 41 years old — placed her in a high-risk category.  It was determined that she was Rh-negative and required an immune-globulin injection as soon as possible.  (Tr. 420).  On January 6, 2015, plaintiff sought emergency treatment in Tucson, Arizona, for vaginal bleeding and abdominal pain, reporting that she was about 5 weeks pregnant.  (Tr. 494-95, 503).  Blood tests and ultrasounds established that she was at approximately 13 weeks and had a uterine fibroid.  No concerns about fetal health were identified.  (Tr. 504).  She was to be followed with additional ultrasound as clinically warranted.  She tested positive for high-risk human papilloma virus.  (Tr. 432).  There are no records of further medical care while plaintiff was in Arizona.

Plaintiff missed an appointment at St. Mary's in St. Louis on February 5, 2015.  (Tr. 417).  She was not seen again until April 23, 2015, when she went to the emergency department at Mercy Hospital.  (Tr. 284-310).  She was admitted for bed rest and monitoring of possible late presentation cervical insufficiency.  She gave birth to her son on April 25, 2015, at 28 weeks gestational age.  He was placed in the neonatal intensive care unit, and she was discharged on April

27, 2015.  She returned to the emergency department on May 27, 2015, with complaints of excessive bleeding.  (Tr. 311-40).  On examination, it was determined that she had no active hemorrhage.  She was hemodynamically stable, and her hemoglobin had improved since she gave birth.  In July 2015, it was noted that she took iron and ibuprofen as needed.  (Tr. 341-47).

The next entry is dated October 9, 2015, when plaintiff was seen at Affinia Healthcare by David Richards, M.D.  (Tr. 350-53).  Plaintiff reported that she had been feeling depressed for three or four months.  She had previously taken antidepressant medication but could not recall which one.  She denied that she experienced suicidal or homicidal ideation, hallucinations, manic symptoms, or paranoia.  She had chronic back pain due to a workplace injury but had not experienced any recent change.  She had no difficulty with bladder or bowel function and no weakness in her legs.  She was taking ibuprofen for pain and a prenatal vitamin.  On examination, it was noted that plaintiff was not in distress, had negative straight leg raising, full muscle strength, and normal reflexes.  She was assessed with lumbago, and major depressive disorder, recurrent, moderate.  She was prescribed a nonsteroidal anti-inflammatory for pain, and bupropion, citalopram, and trazodone for depression.  Based on her score on a screening instrument, social worker John Rajeev, L.C.S.W., assessed plaintiff as moderately depressed and assigned her a score of 50 on the Global Assessment of Functioning (GAF) scale.[9]  (Tr. 354-56).  Mr. Rajeev cited severe psychosocial stressors as a factor in plaintiff's mental health presentation, including her primary support group, social environment, occupation, finances, and access to health care.  She was scheduled to return on October 30, 2015, but there is no indication that she did so.

---

[9] The ALJ gave no weight to this score, noting that the GAF reflects a clinician's subjective determination of the individual's symptoms at the time of the assessment.  GAF scores were "transient," and did not necessarily provide an accurate description of a claimant's typical ability to function.  Furthermore, GAF scores had been excluded from the Diagnostic and Statistical Manual of Mental Disorders (DSM-V 2013).  (Tr. 29).

In November 2015, plaintiff attended a well-woman appointment at Affinia Healthcare, where it was determined that she had vaginitis.  Plaintiff reported that she was taking her prescribed medications.  An ultrasound in December 2015 disclosed the presence of a single uterine fibroid. (Tr. 372).

On March 14, 2016, Alan Spivak, M.D., completed a consultative examination.  (Tr. 378-80).  Plaintiff reported that she had experienced pain in the plantar surfaces of both feet for three to four years.  She described the pain as most severe in the right foot.  She stated she was able to walk less than 100 feet, stand for 2 to 3 minutes, and climb a flight of stairs, with pain.  She did not use an assistive device.  She took nonsteroidal anti-inflammatories for pain relief.  On examination, plaintiff's thyroid was at least three times normal size.  She had exquisite tenderness on the right plantar surface, with less on the left side.  Nonetheless, her gait was normal, she walked without a limp, could stand on her toes and her heels, and got on and off the table without difficulty. Straight leg raising was positive to 80 degrees on both sides.  Her deep tendon reflexes were present and equal, and her sensory functions were intact.  Dr. Spivak assessed plaintiff with bilateral plantar fasciitis, worse on the right, and thyromegaly.  The ALJ gave great weight to Dr. Spivak's report, even though he provided no opinion regarding plaintiff's ability to perform work-related activities, because his medical findings corresponded with the record as a whole and supported the ability to perform a range of light-exertion work.  (Tr. 29).

On July 7, 2016, Dr. Richards noted that plaintiff was applying for disability based on her plantar fasciitis.  (Tr. 404-07).  She still had depressed mood but was not taking her medication as prescribed.  Examination findings were normal, except for obesity.  Notably, she was not in distress and her thyroid gland was normal.  Dr. Richards increased plaintiff's dosage of Wellbutrin and directed her to contact a podiatrist and see social worker Rajeev John.  He provided her with a

cane and completed a form for a handicapped placard for her car, stating that she was permanently disabled.  (Tr. 396, 398).  The ALJ gave this form no weight, noting that Dr. Richards did not cite objective evidence in support of this assessment.  (Tr. 29).

There is another gap in the record until March 7, 2017, when plaintiff sought emergency care for an asthma attack brought on by anxiety over a confrontation in a store.  (Tr. 414-17).  A review of systems was negative for shortness of breath, chest pain, leg swelling, abdominal pain, dysuria, back pain, myalgias, and headaches, and positive for dizziness, nervousness, and anxiety.  On examination, she was oriented and not in distress.  She had normal ranges of motion throughout, normal cardiovascular findings, normal reflexes, and normal behavior.  The only positive finding was an anxious mood.  Her oxygen saturation levels were normal, and she was not in respiratory distress.  She was prescribed lorazepam and an antihistamine for anxiety.

On December 13, 2017, podiatrist Carmina Quiroga, D.P.M., reported that she had taken over plaintiff's care for conditions relating to her feet, effective December 4, 2017.  No other records from Dr. Quiroga appear in the record.

### C.    Opinion evidence

On March 19, 2016, psychologist Vivian R. Knipp, Ph.D., completed a consultative psychological evaluation.  (Tr. 387-93).  Plaintiff reported that she still heard the accident in which her aunt died.  Following the accident, she was taunted by schoolmates and required special education services.  As an adult, she was unable to maintain employment due to interpersonal conflicts.  She described her only success as running a licensed daycare center for five or six years.  She lost the business when the neighborhood was declared blighted.  She then went to live with her daughter in Arizona, whom she reported took care of her for 10 years.  As Dr. Knipp noted, that meant that her daughter was 13 years old when she asked plaintiff to come live with her.  Dr.

10

Knipp described plaintiff as generally confused about the events in her life and a questionable historian. During the interview, plaintiff was fidgety and very tangential. She cried frequently but stopped abruptly when Dr. Knipp warned her that they would run out of time. Dr. Knipp described the transition in plaintiff's mood as abrupt, atypical, and dramatic. (Tr. 389). During the cognitive assessment, plaintiff was unable to repeat 6 digits forward. She knew the current president but could not identify any past presidents, even when prompted with cues, such as the first president of the United States. She could not do simple calculations or interpret proverbs but could identify the essential shared characteristics of objects. Her insight and judgment were poor. She put forth minimal effort on tests of cognitive functioning, with significant discrepancies across the scales. Thus, her Full-Scale IQ score of 51 was not considered valid. Furthermore, it was inconsistent with her contention that she ran a successful licensed daycare center for several years. Her score of 59 on the General Abilities Index (GAI) was "clinically and statistically significant" and placed her in the mildly impaired range. Even this level of impairment was inconsistent with her claim that she ran a daycare center. Dr. Knipp diagnosed plaintiff with borderline personality disorder and noted that people with this diagnosis frequently have difficulty maintaining jobs that require interpersonal skills. Dr. Knipp opined that plaintiff likely could not manage her own funds, a finding that the ALJ rejected because it was based on a single examination in which plaintiff put forth minimal effort and was inconsistent with plaintiff's other mental status examinations, her prior ability to work with her conditions, and her previously reported activities. (Tr. 29).

On March 28, 2016, State agency psychological consultant Keith L. Allen, Ph.D., completed a Psychiatric Review Technique form based on a review of the records. (Tr. 85-87). Dr. Allen concluded that plaintiff had a primary severe impairment in listing 12.04 (affective disorders) and a secondary severe personality disorder. Dr. Allen noted that the Teleclaim

interviewer described plaintiff as "polite and cooperative over the phone.  She was very upset about her situation and cried during the interview but was a good historian.  She seemed depressed." (Tr. 166).  Dr. Allen also noted that plaintiff did not have any record of seeking mental health treatment before April 2015, was not prescribed medication until October 2015, and presented with no psychiatric symptoms when seen in November 2015.  Plaintiff's claims that she had problems with memory, completing tasks, concentrating, understanding, following instructions, and getting along with others were not supported by the medical record or her self-report that she could complete chores, shop, drive, use public transportation, prepare simple meals, complete self-care, take medications without reminders, manage her own finances, and take care of her son.  In assessing the paragraph B criteria (20 C.F.R., Part 404, Subpart P, Appx. 1) for plaintiff's affective disorder, Dr. Allen opined that plaintiff had mild restrictions in the activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.  She had no episodes of decompensation of an extended duration.

Dr. Allen also competed a Mental Residual Functional Capacity Assessment.  (Tr. 89-90).  He found that plaintiff was not significantly limited in the abilities to remember locations and work-like procedures; understand, recall, and carry out simple instructions; maintain attention and concentration for extended periods; adhere to a schedule and be punctual; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; and adhere to a normal work schedule.  She was moderately limited in her ability to deal with the general public but otherwise was not significantly limited in her ability to engage in appropriate work-place interactions with others.  Finally, she was moderately impaired in her ability to adapt to changes in the work setting.

12

The ALJ gave mostly great weight to Dr. Allen's opinion, finding it consistent with plaintiff's mental status examinations, conservative treatment history, and her previously reported ability to clean her home, cook, shop, and care for her son.  (Tr. 28-29).  The subsequent amendment of the applicable regulations reduced the relevance of Dr. Allen's paragraph B findings somewhat but did not affect his determinations of severity or resulting functional limitations.

Following the hearing in this matter, the ALJ asked psychiatrist Derek Vines, M.D., to complete medical interrogatories and a medical source statement, based on a review of the record. (Tr. 524).  Dr. Vines completed both documents in March 2018.  (Tr. 525-27, 528-32). In response to the medical interrogatories, Dr. Vines identified plaintiff's impairments as a reduced ability to concentrate and maintain pace associated with depression, and interpersonal difficulties associated with borderline personality disorder.  He noted, however, that it was unclear that she continued to be depressed and there was no evidence of the more extreme behaviors typically associated with borderline personality disorder, such as repeated suicidal behaviors.  With respect to possible cognitive limitations, Dr. Vines noted that plaintiff's Full-Scale IQ score of 51 would typically be associated with significant impairment.  In this case, however, the score was not a valid indicator of plaintiff's actual functioning because there were significant discrepancies in the test results and the score was inconsistent with plaintiff's prior functioning.  The GAI score of 59, indicating mild impairment, was more representative.[10]  Dr. Vines noted that plaintiff reported that she cooked, cleaned, shopped, and compensated for memory deficits by posting reminder notices.   The interrogatories asked Dr. Vines to assess plaintiff's degree of limitation under the paragraph B functional categories:  (1) understanding, remembering, and applying information; (2) interacting

---

[10] Dr. Vines concluded that plaintiff's borderline personality disorder, learning or intellectual disability, and depression were not associated with sufficient impairment to satisfy a listing.

with others; (3) concentrating, persisting, or maintaining pace; and (4) managing oneself.  Dr. Vines opined that plaintiff was moderately limited in all four categories.  He stated in conclusion that "[s]ignificant ambiguity exists as to a valid evaluation of [cognitive abilities] . . . but with work that requires limited interpersonal interaction to compensate for Borderline Personality Disorder, she may function better."  (Tr. 532).

In completing the Medical Source Statement of Ability to Do Work-Related Activities, Dr. Vines checked boxes indicating that plaintiff was moderately impaired in the abilities to understand, remember, and carry out both simple and complex instructions; and make judgments on both simple and complex work-related decisions.  She was also moderately impaired in the abilities to interact appropriately with coworkers, supervisors, and the public, and to respond appropriately to usual work situations and changes in the work setting.  (Tr. 525-27).

The ALJ summarized Dr. Vines's opinion as finding "moderate limitations in all functional areas based on her past functioning" and gave his opinion "the greatest weight."  (Tr. 24, 28).  In support, the ALJ noted that Dr. Vines had expertise in psychiatry and the criteria for disability under the Social Security Act and had the opportunity to review the entire medical record.  His opinion was also consistent with the record as a whole, including exam findings, conservative and limited treatment despite Medicaid coverage, prior ability to work fulltime despite her mental conditions, and activities of daily living.  Plaintiff agrees that Dr. Vines's opinion is entitled to great weight.

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Pate-Fires, 564 F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006);

Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high."  Id.   Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.; see also Stewart v. Sec'y of Health

& Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 20-31). The ALJ found that plaintiff had not engaged in substantial gainful activity since August 11, 2015, the application date. (Tr. 19). At step two, the ALJ found that plaintiff had the severe impairments of plantar fasciitis, thyromegaly, sinus disease, obesity, learning disorder, major depressive disorder, anxiety disorder, and borderline personality disorder. (Tr. 22). The ALJ found that plaintiff's uterine fibroid, ovarian cyst, vaginitis, irregular menses, and history of concussion did not cause more than minimal functional limitations and were nonsevere. The ALJ found that there was no medical support for plaintiff's other allegations of disabling conditions, such as asthma, migraines, PTSD, and incontinence. Thus, these conditions were not medically determinable impairments. (Tr. 22-23). Plaintiff does not challenge the ALJ's assessment of her impairments.

The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  (Tr. 23-24).  The ALJ considered listings 1.02 (major dysfunction of a joint), 3.02 (chronic respiratory disorders), 9.00 (endocrine disorders), 4.00 (cardiovascular system), 5.00 (digestive system), and 11.04 (vascular insult to the brain.  The ALJ also found that plaintiff's mental impairments did not meet or equal the criteria of listings 12.04 (depressive, bipolar, and related disorders), 12.05 (intellectual disorder), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), or 12.11 (neurodevelopmental disorders).  The ALJ analyzed plaintiff's mental impairments under the paragraph B criteria and determined that plaintiff had moderate limitations in the areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (Tr. 23).  Plaintiff did not meet the paragraph C criteria.  Finally, the ALJ determined that the combination of plaintiff's severe impairments and obesity did not result in sufficiently severe limitations to meet or equal a listing.  Plaintiff does not challenge the ALJ's assessment of her severe impairments or the paragraphs B and C criteria.

The ALJ next determined that plaintiff had the RFC to perform light work, except that she could not operate foot controls; climb ladders, ropes or scaffolds; kneel or crawl; but could occasionally climb ramps and stairs, balance, stoop, and crouch. She could not be exposed to irritants, unshielded moving parts, or unprotected heights, and should not drive as part of the work function.  She could remember, understand, and carry out simple and routine instructions consistent with SVP levels 1 and 2 jobs, but should have only occasional interaction with the general public and coworkers.  (Tr. 25).  In assessing plaintiff's RFC, the ALJ summarized the medical record, as well as plaintiff's written reports and testimony regarding her abilities,

conditions, and activities of daily living.  While the ALJ found that plaintiff's severe impairments could reasonably be expected to produce some of the alleged symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence and limiting effect of her symptoms were "not entirely consistent with" the medical and other evidence.  (Tr. 26).

At step four, the ALJ concluded that plaintiff was unable to perform any past relevant work.  (Tr. 30).  She was 41 years old when she filed her application and was considered a "younger individual."  She had at least a high school education and was able to communicate in English.  Id.  The transferability of job skills was not material because the Medical-Vocational Guidelines supported a finding that she was not disabled regardless of whether she had transferable skills.  The ALJ found at step five that someone with plaintiff's age, education, work experience, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a housekeeping cleaner, dining room attendant, and small product assembler.  Furthermore, even if she were limited to sedentary work with constant use of a handheld assistive device, with the ability to lift and carry with the other arm, plaintiff could work as a small product assembler II, circuit board touch-up worker, and small product assembler.  (Tr. 30-31).  Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act since August 11, 2015, the application date.  (Tr. 31).

## V.  Discussion

Plaintiff argues that the ALJ erred by failing to address material limitations identified by Dr. Vines, despite giving his opinion "greatest weight."   Thus, she contends, the RFC determination is not supported by substantial weight.[11]

In his medical source statement, Dr. Vines opined that plaintiff was moderately impaired in the abilities to understand, remember, and carry out simple instructions; and to make judgments on simple work-related decisions.[12]   The ALJ accounted for these limitations in the RFC by restricting plaintiff to "SVP levels 1 and 2 type jobs."  (Tr. 25).  The ALJ also adopted Dr. Vines's opinion that plaintiff was moderately impaired in the ability to interact appropriately with the general public and coworkers.  But, the ALJ neither accepted or rejected the portions of Dr. Vines's statement in which he opined that plaintiff was moderately impaired in the abilities to interact appropriately with supervisors and respond appropriately to usual work situations and changes in a routine work setting.  These mental abilities are necessary components of full-time work.  "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) . . . to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.  This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base."  Titles II & XVI: Capability

---

[11] Plaintiff also asserts that the ALJ was required to present these additional limitations to the vocational expert.

[12] Dr. Vines also opined that plaintiff was moderately impaired with respect to complex instructions and work-place decisions, but the ALJ limited plaintiff to jobs having an SVP of 1 or 2, and thus limitations related to complex situations are not relevant.

to Do Other Work — The Medical-Vocational Rules As a Framework for Evaluating Solely Nonexertional Impairments, SSR 85-15, 1985 WL 56857 (S.S.A. 1985).

When determining a plaintiff's RFC, an ALJ must consider "all relevant evidence," but ultimately, the determination of the plaintiff's RFC is a medical question.  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  As such, the determination of plaintiff's ability to function in the workplace must be based on some medical evidence.  Id.  While the opinion of a consulting physician who examines a claimant once or not at all is not generally given great weight,  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000), where an ALJ does give weight to a consultative physician's opinion, the ALJ must give an explanation before disregarding that opinion in formulating a plaintiff's RFC.  Murphy v. Colvin, No. 1:15-CV-00131-AGF, 2016 WL 4158868, at *6 (E.D. Mo. Aug. 5, 2016); see also McCadney v. Astrue, 519 F.3d 764, 767 (8th Cir. 2008) ("Our primary difficulty is not with the possibility that the ALJ discounted [the consultative physician's] opinion, as an ALJ is free to discount a physician's report if the record warrants this . . . .  The problem with the ALJ's opinion is that it is unclear whether the ALJ *did* discount [the] opinion, and, if it did so, why.") (emphasis in original); Weed v. Saul, No. 4:18-CV-001192-SPM, 2019 WL 4451259, at *5 (E.D. Mo. Sept. 17, 2019) (remanding where ALJ failed to address consultative examiner's limitation on reaching);  Crews-Cline v. Colvin, No. 4:13-CV-00732-NKL, 2014 WL 2828894, at *2 (W.D. Mo. June 23, 2014) (remanding where the ALJ gave great weight to opinion of consulting physician but offered no explanation for excluding some limitations from RFC); Pearson v. Astrue, No. 8:11CV83, 2011 WL 5142730, at *8 (D. Neb. Oct. 28, 2011) (remanding ALJ decision where ALJ gave significant or great weight to opinions but neither adopted nor discounted certain limitations); Reynolds v. Astrue, No. 1:06 CV 64 CDP DDN, 2007 WL 5100461, at *3 (E.D. Mo. Aug. 7, 2007) (same).

Here, the ALJ failed to address Dr. Vines's opinion that plaintiff has moderate limitations in the abilities to interact appropriately with supervisors and respond appropriately to usual work situations and changes in a routine work setting. As noted above, the erosion of these basic work-related activities would severely limit the potential occupational base and, thus, the exclusion of these limitations from the RFC was not harmless. See Porter v. Berryhill, No. 4:17-CV-00072-NKL, 2018 WL 1183400, at *9 (W.D. Mo. Mar. 7, 2018) (remanding where ALJ failed to address opinion that claimant was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors).

Defendant does not refute plaintiff's argument that the ALJ committed reversible error by failing to address all the limitations set out by Dr. Vines. Instead, defendant contends that the RFC found by the ALJ is supported by substantial evidence and that, based on that RFC, the ALJ properly determined that plaintiff could perform work available in the economy. The Court would likely agree, if the ALJ had either expressly accepted or rejected the limitations identified by Dr. Vines in formulating plaintiff's RFC.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's decision is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*

JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of November, 2020.